**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**GEOFFREY H. ANDERSON,**

      **Plaintiff,**

**vs.**                                     **Case No. 4:09cv142-RH/WCS**

**HOLLY LOFLAND,
JASON NEWHOUSE,
and JODY FRUCHTNICHT,**

      **Defendants.**

_____/


## REPORT AND RECOMMENDATION

Defendants filed a motion for summary judgment.  Doc. 70.  Plaintiff, who is *pro se*, has filed a response.  Doc. 105.  The summary judgment motion is now ready for a ruling.

**Plaintiff's claims in his Fourth Amendment Complaint, doc. 19**

Plaintiff has asserted claims under 42 U.S.C. § 1983, 42 U.S.C. § 1985, and 42 U.S.C. § 1986.  Doc. 19, p. 3.  The events occurred on December 30, 2005, when Plaintiff's vehicle was stopped and Plaintiff was arrested.  *Id.*, at 6-7.  Plaintiff contends that Defendant Lofland, a Tallahassee Police Officer, used unnecessary, excessive force against him, and violated Plaintiff's Fourth Amendment rights "without probable cause or legal justification" and violated Plaintiff's due process rights and equal protection rights.  *Id.*, at 8.  Plaintiff also brings the same claims against Defendants

Newhouse and Fruchtnight, police officers, that they used unnecessary, excessive force against him, and violated his Fourth Amendment rights, due process and equal protection rights.  *Id.*, at 8-9.  Plaintiff additionally asserts claims against all three Defendants for deliberate indifference to Plaintiff's medical needs.  *Id.*, at 9.  He also raises several state law claims including assault, excessive force, illegal use of deadly force, and battery.  *Id.*, at 10-15.

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment Defendants initially have the burden to demonstrate an absence of evidence to support the nonmoving party's case.  Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986).  If they do so, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial.  *Id.*  An issue of fact is "material" if it could affect the outcome of the case.  Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted).  Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient.  The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Hickson Corp., 357 F.3d at 1260, *quoting* Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986).  All reasonable inferences must be resolved in the light most favorable to the nonmoving party, Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999), if there is a

genuine dispute as to those facts. <u>Scott v. Harris</u>, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), *cited in* <u>Ricci v. DeStefano</u>, 129 S.Ct. 2658, 2677 (2009). "Where the record *taken as a whole* could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Matsushita Elec. Industrial Co.,</u> 475 U.S. at 587 (internal quotation marks omitted, emphasis added), *quoted in* <u>Ricci v.</u> <u>DeStefano</u>, 129 S.Ct. at 2677.

Of particular relevance to this case is the Supreme Court's cautionary advice that "[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." <u>Scott</u>, 550 U.S. at 380, 127 S.Ct. at 1776. In the <u>Scott</u> case, as in this case, the parties have (unsurprisingly) presented two very different versions of the events at issue, but video evidence has been provided. The Supreme Court admonished that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott</u>, 550 U.S. at 380, 127 S.Ct. at 1776 (finding that "Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him."). Put another way, in determining the relevant facts for summary judgment purposes, inferences for the non-moving party may be drawn only "to the extent supportable by the record." <u>Penley v.</u> <u>Eslinger</u>, 605 F.3d 843, 848 (11th Cir. 2010), *quoting* <u>Scott</u>, 550 U.S. at 381, n.8, 127 S.Ct. at 1776, n.8.

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on

file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v.
Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting*
Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The
nonmoving party need not produce evidence in a form that would be admissible as Rule
56(e) permits opposition to a summary judgment motion by any of the kinds of
evidentiary materials listed in Rule 56(c).  Owen v. Wille, 117 F.3d at 1236; Celotex, 477
U.S. at 324, 106 S. Ct. at 2553.

**The relevant Rule 56(e) evidence**

> **Defendants' evidence, doc. 70**

All three Defendants were employed as Tallahassee Police Officers and acted in
that capacity during the encounter with Plaintiff on December 30, 2005.  Doc. 70, p. 5;
exhibits A, B, and C.  At approximately 10:20 pm., Defendant Lofland observed Plaintiff
violate several traffic laws while driving a green Ford Explorer.  Doc. 70, p. 5; ex. A
(doc. 70-1).  Defendant Lofland stopped Plaintiff for those traffic violations and during
the stop, Plaintiff's conduct led her to believe he was impaired.  *Id.*  Defendant Lofland's
patrol car video recording system was activated and recorded her encounter with
Plaintiff.  Doc. 70, ex. A, *citing* to ex. D.[1]

Defendant Lofland advised Plaintiff of the reason he was stopped, and asked him
for his driver's license, insurance and registration.  Doc. 70, ex. A (doc. 70-1).  "Plaintiff
had trouble obtaining the requested documents" and Defendant Lofland smelled a
"strong odor of an alcoholic beverage on" Plaintiff's breath.  *Id.*  She observed his

---

[1] Defendant Lofland's affidavit, ex. A, attests to the authenticity of the video
recording of that night, and the DVD is filed as Defendants' exhibit D.

exaggerated hand movements, and noted Plaintiff had a flushed complexion, bloodshot and watery eyes, and dry mouth. *Id.* She asked Plaintiff to exit his vehicle and she conducted field sobriety tests. *Id.* Based on the totality of her observations, Defendant Lofland determined there was probable cause to arrest Plaintiff for driving under the influence of alcohol. *Id.* Defendant Lofland began escorting Plaintiff to the front of her police vehicle for arrest and handcuffing when Plaintiff "began to physically resist and struggle with [Defendant Lofland] in an effort to avoid arrest and flee the scene." *Id.* Plaintiff began "pulling away" from her and grabbed her left arm. She told Plaintiff to stop and he said, "No." Plaintiff said he "just wanted to go home" and said his family was waiting for him. *Id.*

As soon as Plaintiff began his physical resistance, Defendant Lofland "instinctively attempted to regain control of plaintiff to quickly end his resistance by grabbing plaintiff by the neck with [her] right hand." *Id.* "Plaintiff countered [her] attempt to regain control by grabbing" Defendant Lofland's right wrist. *Id.* They rotated in the struggle and Plaintiff pushed her "onto and tried to pin [her] to the hood" of the police car. *Id.* Defendant Lofland testifies that she was in fear for her safety, and "moved away from the hood of the police car and tried unsuccessfully to kick or knee plaintiff in the groin area and at the same time tried to pull plaintiff to the ground." *Id.*

Defendant Lofland states that the "struggle continued off camera for a short period of time" but when "back on camera, plaintiff escaped [her] grasp in an attempt to flee to his SUV." *Id.*, at 3. Defendant Lofland believed Plaintiff was trying to flee the scene, so she followed Plaintiff to his vehicle to keep him from driving away. *Id.* Defendant Lofland "made a 10-24 radio call for emergency back up." *Id.* When Plaintiff

reached the driver's side door of his vehicle, he tried to open the door and get his keys out of his right front pocket.  *Id.*  Defendant Lofland "hit plaintiff several times in the left side of his back with [her] fist in a[n] effort to keep him from getting into his SUV and escaping."  *Id.*  Plaintiff still managed to open his door and get in the vehicle, and Defendant Lofland "leaned inside the SUV and continued to grab and hit plaintiff with [her] hands and closed fists in an effort to keep him from starting the SUV and fleeing the scene."  *Id.*

Although Plaintiff was "able to start his SUV, [Defendant Lofland] was able to prevent him from fleeing the scene before backup arrived."  *Id.*  Backup arrived and forcibly removed Plaintiff from the vehicle to the ground.  *Id.*  Defendant Lofland began to back away but noticed Plaintiff's SUV "moving away, so [she] ran to it, entered it and stopped it."  *Id.*  From that point forward, Defendant Lofland states that she "had no other physical involvement with plaintiff."  *Id.*

In her affidavit, Defendant Lofland states her belief that considering the totality of the circumstances, her "use of force in overcoming plaintiff's resistance and his efforts to escape custody and flee the scene was objectively reasonable."  *Id.*

Paramedics were called to the scene to treat Plaintiff and Defendant Lofland. Doc. 70, ex. A, p. 3.   The policy of the Leon County Jail is "that no arrestee with visible injuries would be allowed to be booked into the jail unless and until he/she was medically cleared."  *Id.*  "Plaintiff was medically cleared at the scene by EMS paramedics."  *Id.*  Defendant Lofland is "not authorized to override medical decisions by EMS paramedics."  *Id.*

Defendant Newhouse also submitted an affidavit.  Doc. 70, ex. B (doc. 70-2).

Defendant Newhouse heard the 10-24 radio call from Defendant Lofland and he

explains that such a "call requires that every officer who hears the call respond

immediately and go to the aid of the officer making the call."  *Id.*  He "arrived on the

scene after Officer Fruchtnight and Officer Paul Donaldson had taken plaintiff to the

ground."  *Id.*

Defendant Newhouse also explained that when he "arrived on the scene, plaintiff

was on the ground on his back flailing his hands and arms and generally continuing to

resist the other officers' attempt to turn him on his stomach, overcome his resistance

and secure his hands for handcuffing."  *Id.*, at 2.  Defendant Newhouse approached

from Plaintiff's left side while Plaintiff "was on his back and administered two weak leg

strikes to plaintiff's left arm/shoulder, which according to TPD policy is an appropriate

and reasonable response to the level of resistance [he] observed by plaintiff."  *Id.*

"Despite the two weak leg strikes, plaintiff continued to resist."  *Id.*  Defendant

Newhouse "then assisted the other officers in turning plaintiff to his stomach at which

time he ceased his resistance and was handcuffed."  *Id.*  Defendant Newhouse did not

strike or kick Plaintiff beyond the "two weak leg strikes administered upon arriving on

the scene."  *Id.*

Defendant Jody Fruchtnicht also submitted an affidavit in support of the summary

judgment motion.  Doc. 70, Ex. C (doc. 70-3).  Defendant Fruchtnicht heard the 10-24

radio call from Defendant Lofland and responded.  *Id.*  Defendant Fruchtnicht and

Officer Donaldson "were the first police officers to arrive on the scene in response to

Lofland's 10-24 call."  *Id.*, at 2.  Defendant Fruchtnicht observed Defendant Lofland

struggling with Plaintiff "who was inside an SUV that had a running motor." *Id.*

Defendant Fruchtnicht testified that "Lofland was also partially inside the SUV on the

driver's side." *Id.* Defendant Fruchtnicht and Officer Donaldson "grabbed plaintiff and

forcibly removed him from the SUV and to the ground." *Id.*

While Plaintiff was on the ground, Defendant Fruchtnicht "gave him repeated

verbal commands to get on his stomach and stop resisting but plaintiff refused to do so."

*Id.*, at 2. Although Plaintiff "continued to resist" efforts of the officers to turn him on his

stomach for handcuffing, Defendant Fruchtnicht states that he never struck or kicked

the Plaintiff. *Id.*

Eventually, Plaintiff was turned on his stomach, handcuffed, and then placed in

Defendant Fruchtnicht's "police car for transportation to the Leon County Jail." *Id.*

Defendant Fruchtnicht confirms that Plaintiff was "medically cleared at the scene by

EMS paramedics" and then Defendant Fruchtnicht transported Plaintiff to the Jail where

he was booked. *Id.*

All three Defendants explained that their training and experience led them to

understand "it was crucial for the safety of all involved that immediate action be taken to

regain control of and handcuff plaintiff." Doc. 70, exhibits A-C (doc. 70-1, p. 2; doc. 70-

2, p. 2; doc. 70-3, p. 2). The three Defendant officers state that they are "trained to

immediately evaluate the resistance" observed and choose an "appropriate force

option" in response. *Id.* They have "only seconds to evaluate the situation at the sene

and to take appropriate action." *Id.*

**Plaintiff's evidence, doc. 88**[2]

Plaintiff filed an affidavit in opposition to the summary judgment motion.  Doc. 88,

Ex. A (doc. 88-1).  In the late evening of December 30, 2005, Plaintiff was driving home

from downtown Tallahassee when a Tallahassee police car pulled behind Plaintiff's

vehicle "and activated its blue lights."  *Id.*, p. 2.  Plaintiff "immediately pulled to the side

of the road, which had a curb but no shoulders."  *Id.*, at 3.  Plaintiff said that Defendant

Lofland approached his car window and began asking him questions.  *Id.*  Plaintiff

contends that he was cooperating with Defendant Lofland, but she "became threatening

and abusive, and at one point she grabbed" him.  *Id.*  Plaintiff said that when he

"flinched," she threatened him "saying, you do that again, and I'll clock you."  *Id.*, at 3-4.

Plaintiff testified in his affidavit that Defendant Lofland's verbal threats "scared"

him, so he "decided not to continue with the field sobriety test."  *Id.*, at 4.  Plaintiff states

that Defendant Lofland did not advise him that he "was under arrest" but she again

grabbed him.  *Id.*  "Fearing violence" by Defendant Lofland, Plaintiff says that he

"pushed Lofland's hand away."  *Id.*  Plaintiff states that she "went berserk" and

"attacked" him by kicking him in the groin.  *Id.*  Plaintiff said that as he "collapsed in

agony, Lofland grabbed [him] in a deadly choke-hold, taking [his] breath" away.  *Id.*

Defendant Lofland then grabbed Plaintiff by the beard, ripping hair from his face, and

---

[2] Pursuant to the December 27, 2010, order, Plaintiff's initial response to the motion for summary judgment (23 pages in length with over 150 pages of exhibits), doc. 88, will be considered.  However, Plaintiff's 94 page memorandum of law, doc. 87, will not be considered.  Plaintiff was directed to file an amended memorandum.  Doc. 95. The amended memorandum contains Plaintiff's asserted statements of undisputed facts.  Doc. 105, pp. 4-7, 12

threw Plaintiff "to the roadway." *Id.* While Plaintiff was lying on the roadway, Defendant Lofland "repeatedly kicked" Plaintiff as he "begged for [his] life . . . ." *Id.*, at 5.

Plaintiff avers that because he feared he "would be killed by Lofland, [he] pulled [himself] up from the roadway and tried to get into [his] vehicle for protection." *Id.* Plaintiff said that Defendant Lofland "tore [his] clothes off of [him] and then maliciously punched [him] many times in the head and abdomen." *Id.* Plaintiff said that he "ignored" those actions "and slowly opened [his] car door and entered [his] vehicle for protection." *Id.*

Defendant Lofland than "jumped on" Plaintiff inside the vehicle, "choked [him] again, and repeatedly struck [Plaintiff] in the face and head, over and over again, until [he] was unconscious." *Id.*, at 5. Defendant Lofland pulled Plaintiff "halfway out" of the vehicle and "repeatedly pummelled [Plaintiff's] face and head." *Id.*

At that point, Plaintiff said that backup officers arrive and grabbed Plaintiff and "dropped [him] on the roadway." *Id.* Plaintiff said he "began convulsing from the beating" inflicted by Defendant Lofland. *Id.* While Plaintiff "lay convulsing on the roadway, [Defendant] Newhouse maliciously kicked [Plaintiff] twice," in Plaintiff's shoulder and back. *Id.*, at 5-6. Defendant Newhouse then helped other officers "properly turning" Plaintiff over to his stomach so he could be handcuffed. *Id.*, at 6. While Plaintiff was lying handcuffed on his stomach on the roadway, other officers circled around Plaintiff and "maliciously kicked [him] repeatedly, including [Defendants] Newhouse and Fruchtnicht." *Id.*

Plaintiff avers he was lifted up, forced to walk to a police car, and "thrown in the back." *Id.* Emergency Medical Service personnel arrived and "attached a portable EKG

machine to" Plaintiff.  *Id.*  Plaintiff asserts that the two "technicians said that [Plaintiff]

was having a heart attack" and told Defendant Lofland and the other officers "that they

needed to take [Plaintiff] to the hospital."  *Id.*  Plaintiff says he begged EMS to take him

to the hospital, but Defendant Lofland "slammed the door of the police car holding

[Plaintiff], and told the EMS techicians [sic] that [he] was going to jail, not the hospital."

*Id.*, at 6-7.  After EMS left the scene, an unidentified "Tallahassee Police officer opened

the car door, then kicked [Plaintiff] in the legs as another police officer took photographs

of" him.  *Id.*, at 7.

Plaintiff provided copies of "incident scene photos" which were taken by Officer

Bascom on December 30, 2005.  Plaintiff's exhibit J (doc. 88-2, pp. 91-95).  He further

presented copies of his booking photograph and other pictures taken at the jail.  *Id.*, at

96-100.  Those reveal small cuts and bruises.

Plaintiff states in his affidavit that he "never 'hit' Holly Lofland or any other police

officer."  *Id.*, at 7.[3]  He further claims to have been "acquitted of using any violence

against any officer."  *Id.*, at 8.

Plaintiff presented copies of the traffic citations he received on Friday, December

30, 2005.  Doc. 88-1, pp. 19-20.  One citation is for refusal to submit to breath, blood or

---

[3] In the amended memorandum, Plaintiff states:  "Plaintiff accurately asserts that,
<u>until</u> Lofland physically attacked him, Plaintiff engaged in no resistance and that any
resulting resistance was self-defense on his part and that at no time did he ever 'hit'
Lofland."  Doc. 105, p. 5.  He then states, "Plaintiff totally denies that (a) he '<u>hit</u>' Lofland
before or after she engaged in physical force against him; (b) he resisted Lofland before
she engaged in physical force against him; (c) his '<u>hitting</u>' Lofland provoked her acts of
physical force against him; and (d) his resistance to Lofland provoked her acts of
physical force against him."  Doc. 105, p. 6.  He states again, "Plaintiff never 'hit'
Lofland, but the Plaintiff has <u>admitted</u> and maintained that he 'pushed her hand away.' "
Doc. 105, pp. 9, 11.

urine tests.  Doc. 88-1, p. 19.  Another citation is for failing to signal for change in

directions,  *Id.*, and the third citation is for running a red light.  *Id.*, at 20.  Plaintiff

submitted the probable cause report which explained the basis for the traffic stop:

> Def was observed to exit Carolina St., onto Monroe St., in front of on-coming
> traffic.  Def then aggressively accelerated and cut across 3 lanes of traffic into
> the left turn lane at Georgia St.  Def turned east on Georgia and rapidly
> accelerated.  Def slowed slightly for the light at Calhoun, and the[n] turned right
> with out stopping.  Def did not stop for the light at Virginia and Calhoun's red
> light.  Def signaled to stop and he quickly pulled over, partially on the
> curb/shoulder area, on he [sic] west side of the roadway.  Def began to wave his
> hand out the window, and then began to lean out the window looking back
> toward this officers car.

Doc. 88-1, p. 21.  Additionally, Plaintiff submitted a copy of the use of force report

submitted by Defendant Lofland to the Police Department.  Doc. 88-1, pp. 29-31.  That

report indicates that both Plaintiff and Defendant Lofland had minor injuries consisting of

abrasions and bruises, and Defendant Lofland's uniform was damaged.  *Id.*, at 29.

Another use of force report states that Defendant Lofland "suffered bruises of her face."

Doc. 88-1, p. 33.

The report further reveals that when Defendant Lofland was struggling to prevent

Plaintiff from inserting his car keys into the ignition, she "reached for OC gas" but

Plaintiff "struck" her arm, "knocking the OC to the right floor board."  Doc. 88-1, p. 31.[4]

That report also indicates that Plaintiff began trying to "punch" Defendant Lofland and

grab her "neck/throat."  *Id.*  She told Plaintiff "to 'stop' several times and he responded

with 'No.' "  *Id.*  Plaintiff continued to push harder and Defendant Lofland "struck

---

[4]  In her deposition testimony, Defendant Lofland stated, "And I attempted to use
OC gas, which he knocked out of my hand and then struck me in the face."  Doc. 88-2,
p. 7 (deposition page number 33)..

[Plaintiff] several times in his face and abdomen and side of face to gain compliance."
*Id.*  Internal Affairs determined that all force used was "justified."  *Id.*, at 30, 34.

Plaintiff also provided a copy of a Leon County Jail report containing "Arrestee
Information."  Doc. 88-3, p. 43 (Plaintiff's Ex. N).  That report is dated December 30,
2005, at 2327 hours, and states that Plaintiff was injured during the arrest, but was
"examined by EMS" and "examined by Jail Medical Unit."  *Id.*  In the comments section
is the notation: "Subject was seen on scene by EMS and was cleared for jail custody by
Nurse Edith Brandt at the facility."  *Id.*

There is undisputed evidence that as a result of the December 30, 2005, stop by
Defendant Lofland, Plaintiff was charged with three counts: (1) resisting officer with
violence; (2) battery on law enforcement officer; and (3) driving under the influence.
Doc. 70, Ex. G (doc. 70-7); doc.88-1, p. 37.  The Amended Information specified that
both counts one and two were related to Plaintiff's physical interaction with Defendant
Holly Lofland.  Doc. 70, Ex. G (doc. 70-7); doc.88-1, p. 38.  Following a jury trial, Plaintiff
was found guilty of all three charges, although the jury found Plaintiff guilty of the lessor
included offense on count I: resisting officer without violence.  Doc. 70, Ex. I (doc. 70-9);
doc. 88-1, p. 40.  Judgment was entered on October 12, 2007.  Doc. 70, ex. J, pp. 1-2
(doc. 70-10).

Plaintiff acknowledges that his "conviction of battery on a law enforcement officer
has not been reversed, expunged by executive order, or declared invalid by a state
tribunal authorized to make such determination . . . ."  Doc. 105, p. 7.

**Video Evidence**

The video from the dashboard camera of Defendant Lofland's police vehicle was submitted as Exhibit D.[5]  The video has been reviewed and shows the following events. Defendant Lofland stopped Plaintiff's vehicle and he pulled over, parking his vehicle partially on the shoulder of the road.  Defendant Lofland approached his window and explained to Plaintiff that he ran a red light and was driving too fast.  She asked for vehicle registration, driver's license, and insurance card, and asked questions about where he had been, where he was going, and why he was in such a hurry.  While waiting for the registration and insurance cards to be provided to her, which was a considerable wait, Defendant Lofland asked Plaintiff how much he had had to drink and Plaintiff answered "I haven't had anything."  She then asked if someone had spilled beer in his vehicle because she smelled something, and at that point Plaintiff said "No, I haven't had anything" but then immediately said he had one drink but he was "fine." Defendant Lofland pointed out that Plaintiff was now changing his story, and Plaintiff again asserted that he was fine.  Defendant Lofland then asked Plaintiff if he would mind if she gave him a sobriety check and asked him to step out of his car.  The time stamp on the dashboard camera at the time Plaintiff existed his vehicle is 23:18:34.

Plaintiff then stepped to the back of his car.  Plaintiff was almost dancing in an effort to show Defendant Lofland that he is fine to drive, but he has difficulty following directions in the way to stand and to keep his head still.  Lofland attempted to check the movement of his eyes, and the video shows that Plaintiff had difficulty holding his head

---

[5] Plaintiff does not dispute the authenticity of the video.  Indeed, at numerous times throughout his response he points to the video evidence presented.  Doc. 105, pp. 8, 19, 24, 28, 36, 38, 39, 41, 43, 44, and 45.

still and only moving his eyes.  Plaintiff continued to insist that he is fine, but asked to go

to the restroom.  Lofland stopped the test and permits Plaintiff to go behind the bushes

to relieve himself.  When Plaintiff returned, she said that now he is going to do a little bit

of walking.  Before Plaintiff even began the test, he asked Defendant Lofland if she

thinks he is "drunk" and she replied, "yea."  Then she explained how he will do the test,

and Plaintiff replied that he is not comfortable doing it.  Defendant Lofland said, "you

don't have to do them if you don't want to."  And Plaintiff asked, "Can I go home?"

Defendant Lofland asked Plaintiff to step over closer to her car and explained to him

that based on his driving, her personal contact with him, and the eye test, she was

willing to make a decision on his impairment issue.  Plaintiff interrupted her again to ask

if he can go home to his family, and she told Plaintiff to listen so he can make an

educated decision about his options.  She explained that the field sobriety tests are

used to determine whether a person is too impaired to drive, and if he did them well,

there would not be probable cause to arrest him.  If he did not do them well, there *would*

be probable cause to arrest him.  She further explained that he could choose not to take

the tests, that he was not required to do so, but if he refused then she wouldl make a

decision on what she has seen, heard, smelled, how he acted, and things of that sort.

Plaintiff acknowledged that he had a drink, but asserted again that he is fine.  Defendant

Lofland said, "But you have not dissuaded my belief that you are impaired."  Plaintiff

responded that he is not impaired and asked her to follow him home.  She informed

Plaintiff that once it is determined that someone is impaired, "we don't let them drive."

He asked if he could call someone, and she answered, "No sir, that was an option you

had before you drove a vehicle this evening."

Plaintiff said that he has not been drinking and driving, he continued to assert that he is fine and said he would like to go home.  Defendant Lofland explained again that she has not seen enough to know that Plaintiff is fine, she will not follow him home, and she said she will not let him drive at this point.  Plaintiff then asked, "can I park my car?" and turned to walk to his car, and she reached for Plaintiff's arm saying no, no, no, and stoppped him from getting to his car.

Plaintiff said I'm going to park my car, and she responded, "you're fixing to get clocked, brother, stand right over here; we ain't done."  He said he wanted to park his car and she told him, "first thing, get your hand out of your pocket."  She then said, "And don't snatch your arm away from me when I'm trying to talk to you."  He said, "I'm sorry I just want to move my car" and she told Plaintiff, "you're not free to leave is what I'm trying to explain to you.  She asked "Do you understand that?" and Plaintiff said, "yes ma'am."

Defendant Lofland told Plaintiff that if he did not want to do the exercises, she was fine with that.  Plaintiff then again asserted that he will do the exercises and started jumping around to prove he is fine.  He asked Defendant Lofland if she wants to watch him do cartwheels and she said she is just trying to get him to walk.  Plaintiff said he will walk, and then turned again and to walk to his car.  She said, "come on back over here, partner, we're done. Come on over here."  Plaintiff asked again, "can I go?"  And Defendant Lofland said "come on over here to the hood of my car."  As they approach the car, she said "put your hands on the hood of my car" and at that point Plaintiff

turned[6] as though he was not going to do so."  Defendant Lofland had had her left arm

outstretched as though she was showing Plaintiff the direction to go and preventing him

from turning back to his own car.  Plaintiff grabbed her arm as he turned to leave and

said "please don't."  Defendant Lofland then reached for Plaintiff with her right arm.

Plaintiff began to spin the Defendant around, saying "please don't" and he struggled

with her, nearly forcing her backwards onto the hood of her patrol car.  She tried to kick

him in the groin and said "you're fixing to . . . ."  As she grabbed Plaintiff, his sweatshirt

began pulling from his body, and Plaintiff said, "Okay, okay, I'll go home."  The struggle

moved off camera with Plaintiff continuing to say "I'll go home, I'll go home," and then,

"please don't, please don't, please don't."  The time stamp on the dash camera as the

physical struggle moved off camera was 23:26:16, but by 23:26:31 they were back on

camera with Plaintiff still struggling and pulling free from Defendant Lofland's grasp.  His

sweatshirt and undershirt came totally off his body.  Plaintiff then ran for his car and as

he reached with his left arm to open the driver's side car door, he threw his shirt in

Defendant Lofland's face.  She called on her shoulder radio, "10-24."

Before Plaintiff could get into his car, Lofland used her body to pin Plaintiff to the

side of his vehicle.  Once pinned, she placed her left arm around his neck as she began

to reach for something with her right hand.  Plaintiff immediately tried to break free and

continued to wrestle with her.  She punched him one time in his left side while Plaintiff

struggled against her trying to get his car door open.  Despite her trying to hold Plaintiff

he continued getting into his car.  She told him to "stop," and Plaintiff said, "ok, I'll stop"

---

[6] The time stamp on the dash camera at this point is 23:26:08, approaching 8
minutes from the time Plaintiff was pulled over.

but he was clearly not stopping.  Plaintiff got into his vehicle and she attempted to hold

on to him.  He said, "my family is waiting" and Defendant Lofland leaned in the vehicle

struggling to prevent Plaintiff from leaving.  The car door remained open as the physical

altercation continued with several horn beeps audible, and the brake lights on Plaintiff's

car lighted up several times.  Defendant Lofland continued to tell Plaintiff to "stop" and

"stop resisting" and Plaintiff said, "I'm not resisting" and she told him, "stop resisting,

you are being placed under arrest."  At several points, a "dinging" sound is audible as

though the key had been inserted into the vehicle's ignition.  Lofland yelled to plaintiff

"Stop, sir, stop" and Plaintiff said "my family . . . ."  She is continued saying "stop, stop"

and ordered Plaintiff several times to "let go, sir" with Plaintiff asserted, "my family."

During this entire struggle, Plaintiff was inside the car and Defendant Lofland was

standing outside Plaintiff's car, but reaching into the vehicle.  Just as the sound of sirens

arrive and police vehicles arrive on scene, Defendant Lofland can be seen hitting at

Plaintiff four times with her right hand and saying "stop."

     Just then, at 23:28:25 on the dash camera, two male police officers rushed in

and all three of them were able to grab Plaintiff, pull him out of the car and throw him to

the ground.  He was on his back and the officers were struggling with him attempting to

turn him over as he continued to resist.  Three more officers arrive and run in to try and

subdue Plaintiff on the ground.  One of those officers used his right leg several times to

force Plaintiff to turn over as other officers on the ground are try to turn Plaintiff, but the

video does not show a full force leg kick.

     As soon as the other officers run in, Defendant Lofland stepped back, but then

ran to Plaintiff's vehicle, which has begun to roll away.  As she bent over to get her

breath, two more officers arrived on scene and attempted to subdue Plaintiff.  Once

Plaintiff is lying face down on the ground and his hands are handcuffed behind his back,

most of the officers moved away while one officer can be seen checking Plaintiff's

pockets.

In the video you can hear Defendant Lofland saying "my OC gas is in the car

somewhere" and she says he hit her in the face a few times.  She says that her

flashlight is in the car somewhere, he got her watch off, and some buttons.  While

Defendant Lofland is looking into his car, other officers got Plaintiff to his feet and put

him in another patrol car.  The time at the beginning of the physical struggle is 23:26:16,

and it ends at 23:28:56 when Plaintiff is handcuffed.

By the time the two EMS officers arrive on the scene, the audio is turned off but

the video continues to run.  The EMS officers go to the patrol car where Plaintiff has

been placed and are with him for several minutes.  Eventually, the EMS officers walk

away and the patrol vehicle leaves, taking Plaintiff to jail.   Defendant Lofland remains

on scene and the EMS officers check her over, and the officers begin paper work, and

securing Plaintiff's vehicle.

**Analysis**

Plaintiff's claim that unnecessary, excessive force was used during the course of

his arrest is analyzed under the Fourth Amendment's "reasonableness" standard.

Graham v. Connor, 490 U.S. 386, 394-95, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443

(1989).  The analysis is objective and the question that must be answered "is whether

the officers' actions are 'objectively reasonable' in light of the facts and circumstances

confronting them, without regard to their underlying intent or motivation."  *Id.* at 397, 109

S.Ct. at 1872.  In evaluating whether the use of force was reasonable, the court should

consider such things as "the severity of the crime," whether "the suspect poses an

immediate threat to the safety of the officers or others," and "whether he is actively

resisting arrest or attempting to evade arrest by flight."  *Id.* at 396, 109 S.Ct. at 1872.

Furthermore, other facts may be considered "in determining whether an officer's use of

force was objectively reasonable, including '(1) the need for the application of force, (2)

the relationship between the need and the amount of force used, (3) the extent of the

injury inflicted and, (4) whether the force was applied in good faith or maliciously and

sadistically.' "  Slicker v. Jackson, 215 F.3d 1225, 1233 (11th Cir. 2000), *quoted in*

Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir. 2008); *see also* Lee v. Ferraro, 284

F.3d 1188, 1198 (11th Cir. 2002).  "Further, the Supreme Court has cautioned that '[t]he

calculus of reasonableness must embody allowance for the fact that police officers are

often forced to make split-second judgments – in circumstances that are tense,

uncertain, and rapidly evolving – about the amount of force that is necessary in a

particular situation.' "  Graham, 490 U.S. at 396–97, 109 S.Ct. at 1872, *quoted in* Penley

v. Eslinger, 605 F.3d 843, 850 (11th Cir. 2010).

It has long been recognized "that the right to make an arrest or investigatory stop

necessarily carries with it the right to use some degree of physical coercion or threat

thereof to effect it."  Graham, 490 U.S. at 396, 109 S.Ct. at 1871-72; Penley, 605 F.3d

at 849.  Therefore, the use of *de minimis* force, without more, does not support a claim

of excessive force.  Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000).

In this case, the video tape evidence so utterly discredits Plaintiff's version of the

events of December 30, 2005, that they cannot be accepted as the correct version of

the facts for purposes of ruling on the motion for summary judgment.  In light of the video, no reasonable jury would believe Plaintiff's statement of the facts.  Therefore, pursuant to <u>Scott</u>, this Court may reasonably rely on the video evidence presented in this case to determine that physical force was necessary in arresting Plaintiff, but was not excessive.

Plaintiff had said that he was cooperating with Defendant Lofland, until she "grabbed" him and threatened him because he "flinched" and then she threatened him saying, "you do that again, and I'll clock you."  That is not true.  The video shows that while Plaintiff was cooperative initially, he was repeatedly asked to drive home and have the Defendant follow him, or allow him to call someone to come get him.  Only after each request was denied and it was clear that Plaintiff was not going to be permitted to just walk away, did Plaintiff make the statement that he wanted to park his car and he walked away from Defendant Lofland.  She reached for Plaintiff's arm to prevent him from leaving, told him "no, no, no," and stopped him from getting to his car.  It is evident from that point forward that Plaintiff was no longer cooperative and he was attempting to drive his car, despite Officer Lofland's commands not to do so, and perhaps he intended to drive away.  It is true that Defendant Lofland threatened him and said, "you're fixing to get clocked, brother, stand right over here; we ain't done."  She did not, however, do anything other than hold Plaintiff's arm so that he could not leave.

Plaintiff says that Defendant Lofland did not advise him that he "was under arrest," but she did tell him that he "was not free to leave" and then "we're done" and instructed Plaintiff to walk to her patrol car.  When she told Plaintiff to put his hands on the hood of her car, Plaintiff again tried to leave.  Plaintiff's version, that he was trying to

break away from Defendant Lofland and get to his car because he feared violence by Defendant Lofland, is not true.  The video depicts a man who is determined not to be arrested.  Plaintiff physically struggled against Defendant Loflan, he continued making comments that he was going home, and that his family was waiting for him.  There was no violence threatened or used except to reasonably effect the detention of Plaintiff.

Plaintiff claimed in his affidavit that he "collapsed in agony" and said Defendant "Lofland grabbed [him] in a deadly choke-hold" and threw Plaintiff "to the roadway." Plaintiff claimed that while he was lying on the roadway, Defendant Lofland "repeatedly kicked" Plaintiff as he "begged for [his] life."  Those statements are false.  Defendant Lofland did hit Plaintiff one time in the side when he first began to struggle against her at her patrol car when he told Lofland he would go home, but she did not strike Plaintiff again until just before the backup officers arrive.  When she hit Plaintiff at that point (four quick strikes), Plaintiff was in the car and it was not possible to tell where she hit him.  Plaintiff had refused to stop resisting arrest and he tried to start his car and leave the scene, so those strikes were entirely reasonable, under the circumstances.

Plaintiff said that Defendant Lofland "tore [his] clothes off of" him, but his clothes would not have come off his body if he were not struggling to break free from Defendant Lofland's grasp.  He further claimed that Defendant Lofland choked him and "repeatedly struck [him] in the face and head, over and over again, until [he] was unconscious." That is not true as Plaintiff was never unconscious on the video, but continuing to struggle.  Plaintiff further said that Defendant Lofland pulled him "halfway out" of the vehicle and "repeatedly pummelled [Plaintiff's] face and head."  *Id.*  Defendant Lofland was never able to pull Plaintiff part way out of the car once Plaintiff got into it.

Moreover, there were just four hits to Plaintiff by Defendant Lofland when Plaintiff was inside his vehicle.

The video does not depict unnecessary excessive force by Defendant Lofland. Rather, it depicts physical force used to gain control over Plaintiff so that he could be restrained and arrested. The force was reasonable, considering Plaintiff's refusal to comply with Defendant Lofland's instructions, his demonstrated effort to leave the scene in his vehicle, and the fact that Plaintiff appeared to be drunk and could not be permitted to endanger the public or himself by getting back in his vehicle and driving away. Summary judgment should be granted in favor of Defendant Lofland on Plaintiff's excessive force claim.[7]

As for the other two Defendants, Plaintiff claimed that while Plaintiff "lay convulsing on the roadway, [Defendant] Newhouse maliciously kicked [Plaintiff] twice," in Plaintiff's shoulder and back. That assertion is also not supported by the video. An officer (it will be assumed the officer is Defendant Newhouse) uses his foot to help officers force Plaintiff to turn over from his back onto his stomach so he could be handcuffed. While a foot was used to do this, the video does not depict a malicious kick to Plaintiff's body. The use of the leg by this officer was to gain Plaintiff's compliance, and it was gained soon after. Plaintiff was turned over and when Plaintiff was handcuffed on his stomach on the roadway, the officers stood up and begin to back away from Plaintiff, except for a few officers who kept Plaintiff lying on the ground while one officer searched Plaintiff's pockets. Contrary to Plaintiff's version of the events,

---

[7] In light of the fact that Plaintiff has failed to show a genuine dispute of material fact, it is unnecessary to engage in analysis of whether or not Plaintiff's excessive force claims are barred by Heck v. Humphrey.

once Plaintiff was handcuffed, officers did *not* circle around Plaintiff and maliciously kick him repeatedly.  All physical force to Plaintiff ceased the moment he was secured in hand restraints.

In summary, "[Plaintiff's] version of events is so utterly discredited by the record {the video tape] that no reasonable jury could have believed him."  Scott, 550 U.S. at 380, 127 S.Ct. at 1776.  Accordingly, summary judgment should be granted in favor of the other Defendants for Plaintiff's claim of using unnecessary excessive force.

Plaintiff also claimed in his affidavit that EMS personnel arrived and "attached a portable EKG machine to" Plaintiff.  Plaintiff asserted that the two "technicians said that [Plaintiff] was having a heart attack" and needed to be taken to the hospital.  That cannot be true either because the video shows the EMS officials walking up with nothing in their hands.  They do not have a portable EKG machine on the scene.  Moreover, Plaintiff said in his affidavit that after EMS left the scene, an unidentified "officer opened the car door, then kicked [Plaintiff] in the legs as another police officer took photographs of" him.  That is not true either.  The video depicts one of the EMS officers walking away from the patrol car where he had been examining Plaintiff and as soon as that EMS official walked away, a police officer got into the driver's seat of the car and drove away with Plaintiff.  In fact, the EMS officers had not even left the scene yet when Plaintiff was taken away in the patrol car.

Plaintiff claimed that Defendants were deliberately indifferent to his serious medical needs, but Plaintiff has failed to present any evidence to support that assertion.  Plaintiff's statement of facts is not supported by the video tape, and he has failed to show that he had any serious physical injuries.  The evidence reveals only abrasions

and bruises to both Plaintiff and Defendant Lofland.  There is no evidence that Plaintiff was denied medical treatment for serious injuries and Defendants are entitled to summary judgment on this claim as well.

Plaintiff has attempted to bring state law claims for assault, battery, perjury, and the intentional falsification of official documents.  Plaintiff's claims for assault and battery all fail because the video evidence contradicts Plaintiff's claims.  Plaintiff was refused to comply with lawful commands and attempted to evade arrest.  Defendants were entitled to use reasonable force to compel his compliance.  No force greater than necessary was used.

Plaintiff's claims for perjury and the falsification of official documents must fail because the undisputed evidence reveals Plaintiff was convicted of DUI and committing battery on Defendant Lofland.  Plaintiff cannot attack the validity of those criminal convictions by this § 1983 action.  It is clear that one may not seek monetary damages which would collaterally undermine a criminal conviction or sentence.  Preiser v. Rodriguez, 411 U.S. 475, 500, 93 S. Ct. 1827, 1841, 36 L. Ed. 2d 439 (1973); Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364, 2372, 129 L. Ed. 2d 383 (1994) (barring a claim for monetary damages related to a conviction or sentence until the plaintiff can show that the conviction or sentence has been invalidated).  In Heck, the Court held "that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question

by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254."  Harden v. Pataki, 320 F.3d 1289, 1294 (11th Cir. 2003), *quoting* Heck, 512 U.S. at 486-87, 114 S.Ct. at 2372.  "A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983."  Heck, 512 U.S. at 487, 114 S.Ct. at 2372.

Plaintiff cannot demonstrate that a Defendant committed perjury of falsified documents because he was convicted of three charges, including DUI, stemming from his December 30, 2005, arrest.  Plaintiff cannot meet the "favorable termination requirement" for bringing this § 1983 action and he is not entitled to relief.  Summary judgment should be granted in favor of Defendants on all claims.

**Sanctions**

This is not Plaintiff's first abusive law suit in this court.  In case number 4:03cv303-WS/WCS, Plaintiff tried to litigate a suit on behalf of his sister, Carolyn R. Anderson.  Doc. 51 (report and recommendation in that case).  Plaintiff is not a lawyer. That case was dismissed for that reason.  Doc. 53 in that case.

In case number 4:08cv549-RH/WCS, Plaintiff alleged that while involuntarily committed to Florida State Hospital for a mental capacity evaluation pending a criminal charge, that his due process rights were violated when he was twice attacked by other patients.  That case ended in summary judgment for Defendant.  Doc. 71 in that file.

In case number 4:09cv133-RH/WCS, Plaintiff filed a frivolous case against the assistant state attorney who prosecuted him.  That case was dismissed due to prosecutorial immunity.  Doc. 18 in that file.

In case number 4:09cv135-RH/WCS, Plaintiff alleged a "retaliation conspiracy" between his own defense attorney, the assistant state attorney prosecuting his case, and a state court judge.  Apparently the criminal case involved charges for driving while intoxicated, resisting arrest, and battery upon a police officer, the same arrest that is the subject of the case at bar.  The case was dismissed for failure to state a claim and to comply with court orders.  Docs. 15 and 17 in that file.

The video evidence in the case at bar reveals that Plaintiff's version of events was a fantasy, and that this law suit was malicious from the outset.  It is recommended that the court so find.

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendants' motion for summary judgment, doc. 70, be **GRANTED**, that the court find that this case was maliciously filed and litigated, and that judgment be entered in favor of Defendants on all claims.

**IN CHAMBERS** at Tallahassee, Florida, on July 12, 2011.


 S/      William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**